THE COMMISSIONERS OF PARKS AND BOULEVARDS OF THE CITY OF DETROIT v. THE DETROIT, GRAND HAVEN & MILWAUKEE RAILWAY COMPANY AND THE CHICAGO, DETROIT & CANADA GRAND TRUNK JUNCTION RAILROAD COMPANY.

*Eminent domain—Crossing railroad right of way—Prior public use.*

1. A railroad company cannot convert its right of way into store room for its cars, and call it a " yard," and thus prevent a street from crossing its right of way.
2. The remaining questions in this case were passed upon in *Commissioners v. Railroad Co.*, 90 Mich. 385, and are ruled by that case.

Appeal from recorder's court of Detroit. (Chambers, J.) Argued March 8, 1892; rehearing granted, and reargued June 30, 1892. Decided July 28, 1892.

Proceedings to condemn a right of way for boulevard purposes across the property of respondents. Respondents appeal. Reversed, and case remanded to jury for further proceedings. The facts are stated in the opinions.

*L. C. Stanley* (*E. W. Meddaugh,* of counsel), for appellants.

*John J. Speed,* for petitioners.

McGRATH, J.   These are proceedings for the opening of
the boulevard in the city of Detroit, over respondents'
rights of way, under Act No. 388, Local Acts of 1889.
Precisely the same questions are raised as were passed upon
in *Commissioners, etc., v. Michigan Cent. R. R. Co. et al.,*
90 Mich. 385, except that here it is insisted that the open-
ing is across lands which are used by the railroad companies
for yard purposes.   It clearly appears from the record that
all of the tracks in use by respondents within the lines of
the proposed boulevard, and for some distance both north
and south, are within the original rights of way of respondents.
The only basis for the claim that the land sought to be con-
demned is railroad yard land is the testimony, upon cross-
examination, of petitioner's civil engineer, who says that it is
a railroad yard.   The yard master called by respondents said:
" We call the Grand Trunk Railroad Y tracks the " 'Yard.' "
This " Y," so-called, is the main line upon which every
train to and from the city runs.   The main track of the
Detroit, Grand Haven & Milwaukee road is upon the right
of way which it is proposed to cross.   In the motions made
to dismiss the petitions in both cases respondents allege,
upon oath, that the lands sought to be taken " are por-
tions of the rights of way of said respondents, occupied by
their main and side tracks."   The yard master says,
further: " Trombly and Milwaukee avenues cross the track.
*These avenues interfere with switching, the same as any
grade crossing, and they take up the storage room for
cars."*

It cannot be contended that a railroad company can so
convert its right of way into store room for its cars, and
call it " a yard," and thus prevent a street from crossing
its right of way.   It cannot be that a railroad company
can condemn a right of way through the city or other

property, and then so convert˶ such right of way, or so denominate it, as to prevent the owners of the property through which that right of way is condemned from obtaining streets across the same. No such use or purpose was contemplated when the right of way was secured.

It is notorious that every street, from Tenth to the westerly limits of the city, is crossed by the Michigan Central, and upon every one of these crossings side tracks have been added, until every foot of space upon the right of way of the company is covered. The Lake Shore & Michigan Southern Railway, the Grand Trunk Railroad, and the Detroit & Bay City Railroad maintain separate tracks and side tracks, with adjoining rights of way, from and across the boulevard on the west, northeasterly to the northerly limits of the city, at a point above the land in question, crossing Michigan avenue, Grand River avenue, Woodward avenue, and again crossing the boulevard and more than a score of other streets. The Detroit, Grand Haven & Milwaukee maintains a main track and two or more side tracks from Croghan street north to the city limits, covering 50 streets in its course. Is it true that a railway company may fill its right of way on a street with side tracks, and that the existence of these side tracks at other points, if called a "yard," will actually prevent the opening of streets across the right of way of the company?

In *Railway Co. v. City of Faribault*, 23 Minn. 167, and in *Union Depot Co. City of St. Paul*, 30 Id. 359 (15 N. W. Rep. 684), it was proposed to take depot grounds.

In *Railroad Co. v. Williamson*, 91 N. Y. 552, the land proposed to be taken had been condemned for depot purposes.

In *Re City of Buffalo*, 68 N. Y. 167, it was proposed to take certain portions of the yards of the railroad company for canal purposes.

In *Re Boston & A. R. R. Co.*, 53 N. Y. 574, the rail-

road company sought to take lands which had been donated to the respondent village for the purpose of a park.

Here neither depot nor yard grounds are proposed to be taken, nor is it proposed to divest the railroad companies of the legitimate use of the land for the purpose for which it was condemned.

The case of *Commissioners, etc., v. Michigan Cent. R. R. Co. et al.*, 90 Mich. 385, involved the crossing of the rights of way of the three roads—the Michigan Cent. R. R. (lessee of the Detroit & B. C. R. R.), Lake Shore & M. S. Ry., and Grand Trunk R. R.—at a point where the rights of way are side by side, where the main and side tracks of each road cross the boulevard, and where the Detroit & Bay City road leaves the line of the other roads, forming a Y, to reach the main tracks of the Michigan Central Railroad. The same questions were raised in that case, except that the Y was not called a part of the yard. All the traffic of the Detroit & Bay City road, and all of the freight traffic of the Grand Trunk, to and from the western portion of the city, crosses the boulevard at that point.

The verdict and order of confirmation must, however, be set aside for the refusal of the court to permit the jury to consider the allowance to respondents of compensation for the expense of erecting safety gates. Upon that point, as well as the other questions raised, the case is governed by *Commissioners, etc., v. Mich. Cent. R. R. Co., et al., supra.*

The causes will be remanded to the jury for further proceedings.

MORSE, C. J., LONG and MONTGOMERY, JJ., concurred with McGRATH, J.

GRANT, J. *(dissenting)*. I can find no reason to justify a reversal or modification of my former opinion in this case, which was handed down May 6, but withheld when

the rehearing was ordered, and now becomes my dissenting opinion.

It was stated upon the rehearing that the respondent obtained the land by purchase. If this be so it clearly has the right to occupy this land for any purpose legitimately connected with railroading. But if it was obtained by condemnation proceedings, why may it not use a reasonable portion of the land thus obtained for yard purposes? All the switching of the Detroit, Grand Haven & Milwaukee Railway Company in connecting with other railroads in the city of Detroit, and in connection with the neighboring factories, is done here. Petitioners' only witness, their own engineer, testified: "It is a railroad yard, with switches and main tracks." The crossing of the boulevard will destroy the yard, and work irreparable injury to the respondents, without any corresponding benefit to the public, who will use the boulevard simply for pleasure. The injustice in establishing a crossing at grade at this point is apparent. It is not to be presumed that the Legislature intended to accomplish an injustice. Neither of the boulevard acts showed the crossing at this place, and we cannot, therefore, presume knowledge of the situation on the part of the Legislature, and that it would have authorized a grade crossing so injurious to respondent and so dangerous to the public.

The following is the opinion referred to above by Mr. Justice GRANT:

GRANT, J. This is a condemnation proceeding, brought for the purpose of obtaining a right of way for the boulevard across the property of these respondents. The jury awarded to the Detroit, Grand Haven & Milwaukee Railway Company $1,420, and to the other respondent $1,302. The jury also found that the public necessity required the crossing in the manner proposed. This was a crossing at

grade, and the jury were instructed to give respondents as damages only the cost of planking and grading. All the questions, save one, now raised were involved in *Commissioners, etc., v. Michigan Cent. R. R. Co. et al.*, 90 Mich. 385, and we see no reason for reversing any of the rulings therein. That case involved the powers of the commissioners to condemn the right of way for the boulevard across the railroad tracks. In the present case is involved the power to condemn a similar right of way across the yard of the respondent railroad companies, which is used for switching and storing cars. On next page is a map showing the situation.

The question is a new one in this Court, and it is of the utmost importance to railroad companies and to the public, who possess the right of carriage over these roads of both person and property. There are one main track and three side tracks of the Detroit, Grand Haven & Milwaukee Railway Company, and two Y tracks of the other respondent. These side tracks are in daily and constant use for storing and switching and marshaling cars, and for the transfer of freight cars from one road to the other. Two engines are there employed in this business from about 7 A. M. to about 5 P. M. daily. Switching is also going on at night. Several factories are situated just south of the proposed boulevard, and some of these tracks are used in taking cars to and from them. Over the main line of the Detroit, Grand Haven & Milwaukee Railway Company, 26 passenger and 12 freight trains pass daily in the dullest season, while in the busy season 14 or 15 freight trains pass each way daily. The distance of the boulevard across this railroad yard is 191 feet. One passing over it, either on foot or by carriage, would be among the railroad tracks for all but 16 feet of this distance.

The petitioners introduced but one witness, their civil engineer. He testified, on direct examination: "To carry

out the general plan of the boulevard, it would be necessary to cross the respondents' tracks." He then produced a map showing the proposed crossing, and testified to the cost of planking and grading. On cross-examination he testified that the place of the proposed crossing was a railroad yard, with switches and main tracks; that he would not consider a grade crossing safe, and that it could only be made safe at great expense. He further testified:

" The boulevard is proposed to be used for pleasure driving, and not for traffic teams. Where now opened, notices are posted to that effect. There is not much traffic at this point which requires the proposed crossing."

It thus appears that this boulevard is established solely for the purpose of pleasure, and not to subserve any business interest. Six or seven car-lengths of each track will be occupied by the boulevard. Two watchmen or gates will be absolutely necessary to secure any degree of safety whatever, and, even with these, danger is imminent and apparent. Under the statute trains cannot obstruct the crossing to exceed five minutes at a time. It is established by the evidence that one, if not two, extra engines and crews would be necessary to do the work which is now done, and that a large amount of storage space would be destroyed. All trains crossing the Grand Trunk and Michigan Central Railroads, when complying with the statute requiring them to stop before crossing another railroad, must stop upon this crossing. The capacity for handling business at this point would be reduced 50 per cent., with the force now required. The cost of erecting gates would be from $500 to $1,000, while the cost of maintaining and managing them would be about $1,000 per year. To employ flagmen or watchmen would cost about the same.

These respondents have long been in possession of this property and used it for the purposes mentioned. That the construction of the boulevard at grade across their yards

will work irreparable injury to them is established beyond controversy. In fact, it will practically destroy the yard and the tracks for the purposes for which they were constructed, and for which they have been and are used. It is stated by all the witnesses that the crossing would be very dangerous, even with the exercise of the greatest precaution.

In disposing of the question, these additional facts must be kept in mind:

1. All the travelers upon this boulevard are there for pleasure, and if they desire, after having traveled over one part of the boulevard, to pass to the other, they can do so in a few minutes' drive, by other streets where crossings are provided.

2. The business in which the respondents are engaged is exclusively a public use. They are *quasi* public corporations, subject to control by the public through the Legislature. They are a public necessity, both for business and pleasure. They are two of the great public arteries of commerce. Their business must be conducted with safety and speed.

The basis of the decision in *Commissioners, etc., v. Michigan Cent. R. R. Co. et al., supra,* was the presumption that the Legislature must have known that the route of the boulevard was across the railroads then in existence. But there is no presumption in the present case that the Legislature knew that its route lay across any depot grounds or railroad yards, in constant use for storage and switching purposes. There is therefore no necessary implication that the Legislature intended to authorize another public use, inconsistent with that to which the land had already been appropriated. *Railway Co. v. City of Faribault,* 23 Minn. 167; *Union Depot Co. v. City of St. Paul,* 30 Id. 359 (15 N. W. Rep. 684); *Railroad Co. v. Williamson,* 91 N. Y. 552; *In re Boston & A. R. R. Co.,* 53 Id. 574; *In re City of Buffalo,* 68 Id. 167.

In *Railroad Co. v. Williamson,* the proceedings were

instituted to lay out a highway across the depot grounds of the railroad company. The evidence showed that all the land was necessary for the use of the railroad, and that the highway would be highly injurious to it and its business, and dangerous to its passengers, by reason of passing hacks and other vehicles. The court rested its decision upon the fact that the land had been already lawfully appropriated, under the right of eminent domain, to a public purpose, and that express and direct legislative authority was necessary to justify its appropriation by proceedings *in invitum* to a different public purpose.

In *Re City of Buffalo,* it was sought to establish a canal through the yards of a railroad company, where there were numerous tracks with switches and turnouts. No express legislative authority was found, and the court held that none could be implied. It was said in that case:

"If a railroad corporation should organize under the general railroad acts, in general terms, to build a railway from Albany to Utica, would there be a necessary implication, from the general gift of power in those acts to take lands, that such corporation could appropriate the town highway, or state canal, or track of the N. Y. C. R. R. Co., already existing in the narrow rocky ravine at Little Falls? And yet it might be made quite plain by testimony that a railroad could not be built through that gorge without taking the place there of one of those existing public works."

In that case the company might have continued the use of its tracks by building bridges over the canal.

In *Railway Co. v. City of Faribault,* the city sought, under its general charter power to take lands for streets, to open a street across the depot grounds. The grounds were about 1,340 feet long, and were already traversed by three streets. The court said that the establishment of the street—

"Must greatly endanger the traveling public, make it

impracticable for the company to transact its necessary business at that point, and deprive it nearly, if not entirely, of all beneficial use and enjoyment of its depot property for the public purpose for which it was condemned."

The coexistence and use of the two easements were held impracticable, if not impossible, and therefore no power to take could be implied.

In *Re Boston & A. R. R. Co.*, it was held that a railroad company could not condemn land dedicated for a public park.

In *Union Depot Co. v. City of St. Paul*, it was held that while the power to extend streets across railway tracks, at suitable and convenient places, was necessarily implied in the general authority, yet that general presumption must yield when the second public use would be subversive of the prior public use.

In the cases above cited, the public use or necessity was not limited to "pleasure drives," as in the present case, but to all the purposes for which highways, canals, and railways can be used.

I find no authority which sustains the petitioners in condemning an easement across this property, nor do I think they can be sustained upon sound principles and reason.

The proceedings should be quashed.