DETROIT, FT. WAYNE & BELLE ISLE RAILWAY *v.* COM-
MISSIONER OF RAILROADS.

RAILROADS—STREET RAILWAYS—CROSSINGS—SAFETY APPLIANCES
—CONSTRUCTION—APPORTIONMENT OF EXPENSE.

Under Act No. 171, Pub. Acts 1893, § 5 ( 2 Comp. Laws, §
6353 ), authorizing the commissioner of railroads to require
proper safeguards to be provided at crossings of railroads and
street railroads, and to apportion the expense between the
companies affected as he may deem just and reasonable,
where a steam-railroad company has constructed its tracks
across an existing street-car line, and subsequently, owing to
the increase of travel on the street and the increased use of
the railroad, the erection and maintenance of safety appli-
ances at the crossing becomes necessary for the protection of
the public, the railroad commissioner may require the street-
railway company to pay a portion of the expense of con-
structing and maintaining such appliances. GRANT, J., dis-
senting.

*Mandamus* by the Detroit, Ft. Wayne & Belle Isle
Railway to compel Chase S. Osborn, commissioner of rail-
roads, to vacate an order requiring relator to share the ex-

pense of constructing and maintaining safety appliances at a railroad crossing. Submitted January 9, 1901. Writ denied July 2, 1901.

*Brennan, Donnelly & Van De Mark* and *Henry E. Bodman*, for relator.

*Horace M. Oren*, Attorney General, for respondent.

MOORE, J. The following statement of facts is taken from the brief of counsel for relator:

"The petition and answer filed in this cause set out as briefly as practicable the facts in the case. In substance, they are that petitioner owns a line of street railway in Detroit, authority to construct and operate which was granted in 1865. In the following year the railway was built, forming a continuous line west on Fort street to Clark avenue, south on Clark to the River road, and then west again on the River road. At the time the track was constructed on Clark avenue, there was no railroad, or highway, street, lane, or alley, or crossing of any kind, over Clark avenue between Fort street and the River road. In 1882 or 1883 the Wabash Railroad constructed a single track across Clark avenue and across petitioner's tracks. Up to that time there had been no crossing over Clark avenue between Fort street and the River road of any kind,—either that of a railroad, or a public highway, a private way, road, street, or alley. In the year 1893 or thereabouts the Union Station was opened at the corner of Third and Fort streets, in Detroit; and since that time said station has been used jointly by the Wabash, the Detroit, Lansing & Northern, the Flint & Pere Marquette, the Detroit & Lima Northern, and the Canadian Pacific Railroads as a terminal point, the tracks over Clark avenue at this point having been increased from one to three to accommodate the increased traffic. These tracks are used as approaches to the Union Station, and incoming and outgoing trains and cars of all the foregoing roads, except the Canadian Pacific Railroad, pass over said tracks. There are 38 regular daily passenger trains crossing Clark avenue upon these tracks. Besides this, the Canadian Pacific uses the station as an Eastern terminus, connecting with the other roads for purposes of through east and west traffic.

" In 1893 the legislature passed an act (No. 171) which provides (section 5) that:

" 'The commissioner of railroads shall * * * examine the crossings of the tracks of railroads and street railroads then existing, and order such changes made in the manner of such crossings, or such safeguards for protection against accidents to be provided thereat, as in his judgment ought to be so made or provided; and shall apportion any expense incident thereto between the companies affected as he may deem just and reasonable.'

" Claiming authority under this act, the respondent has ordered the construction of certain safety devices, and apportioned the expense between the Terminal Association and the Ft. Wayne & Belle Isle Railway Company. Petitioner must bear whatever expenses can properly be imposed upon the Ft. Wayne & Belle Isle Railway Company."

The petition in this case is filed for the purpose of having the order set aside. The answer alleges that, if the street-railway tracks were not constructed in said street,—

"And did not cross the tracks of the said steam railroad, the said safety appliances so ordered as aforesaid would not be required or necessary in the manner in which the order provides they shall be constructed and maintained; that, though the safety gates provided for in such order are designed specially for the protection of the general public traveling on said highway from danger resulting from the said steam railroad, still the derailing and signaling appliances are intended to protect the traveling public on both electric and steam roads from collision at the crossing of the two roads, and that the necessity for the said safety devices results equally as much from the existence and presence of the petitioner's tracks as from the presence of the tracks of the Union Terminal Association."

Counsel for the relator in their brief say:

" There are a number of important questions involved in this controversy, one being the extent of the authority of the railroad commissioner over street-railway companies. We feel it necessary, however, to suggest only one of these questions, because the adjudication thereof in the manner we anticipate will render a consideration of the others unnecessary. We call attention to the fact, fully

set out in the petition, that the necessity for the order of the railroad commissioner, if any there be, is due to the construction of the Terminal Association's tracks after petitioner's tracks were laid. The danger is not caused by petitioner, nor due to its presence in the street. Under the well-settled rule of this court, the cost of making the crossing safe must be borne by the company making the crossing and responsible for the danger. In *People* v. *Railway Co.*, 52 Mich. 277 (17 N. W. 841), it was decided that a statute requiring a railroad company to bear the expense of constructing and maintaining a crossing for a highway, which was laid out after the railroad was built, was unconstitutional and void. The court said that, 'as far as the same can be reasonably accomplished, it [the crossing road] shall reduce the inconvenience occasioned to the public by its own peculiar mode of enjoyment to a minimum. But when the reason ceases, the right of interference must cease.' And it was held that the railroad could not be made to bear the expense of crossing, because it was 'not a contrivance which the existence of the railroad renders necessary, and which otherwise would be needless.'

"In *Chicago, etc., R. Co.* v. *Hough*, 61 Mich. 507 (28 N. W. 532), it was said:

" ' If a railroad interferes with an existing highway, it must bear all the expense of crossing and restoring the highway, as far as practicable, to safe condition. * * * But, as pointed out in *People* v. *Railway Co.*, 52 Mich. 277 (17 N. W. 841), when a new highway is created, then it belongs to those who create it to bear the expense of making the crossing in the condition necessary to meet all the expense and danger which it occasions.'

" The danger which the commissioner wishes to guard against not being in existence before the railroad crossing was constructed, it belongs to the Union Terminal Association, which created it, to 'bear the expense of making the crossing in the condition necessary to meet all the expense and danger which it occasions.' The same principle is recognized and enforced in the following cases: *City of Grand Rapids* v. *Railroad Co.*, 58 Mich. 647 (26 N. W. 159); *Commissioners of Parks & Boulevards of Detroit* v. *Michigan Central R. Co.*, 90 Mich. 385 (51 N. W. 447); *Same* v. *Chicago, etc., R. Co.*, 91 Mich. 291 (51 N. W. 934); *Same* v. *Detroit, etc., R. Co.*, 93 Mich. 58 (52 N. W. 1083); *City of Grand Rapids* v.

*Bennett*, 106 Mich. 528 ( 64 N. W. 585 ); *Gage* v. *Township of Pittsfield*, 120 Mich. 436 ( 79 N. W. 687 ); *Flint, etc., R. Co.* v. *Detroit, etc., R. Co.*, 64 Mich. 350 ( 31 N. W. 281 )."

An examination of these cases will show they were all cases where it was sought to obtain a right of way either for a railroad across a highway, or for a highway across a railroad, or a crossing for one railroad over the right of way of another; and none of the cases relate to the question involved here, as to who shall bear the expense of additional safeguards ordered upon roads which have crossed each other for a long period of time. An examination of the cases will also disclose that, in proceedings by one road for a right of way over another, there are some inconveniences and burdens which must be borne by the senior road for which it is not entitled to compensation from the junior road. In the case of *Flint, etc., R. Co.* v. *Detroit, etc., R. Co.*, 64 Mich. 350 (31 N. W. 281), the former company sought to obtain a right of way over the railroad track of the defendant company. The commissioners allowed only $100 for the land taken and the consequential damages. The defendant company gave evidence tending to show that it would suffer a yearly expense, as the result of establishing the crossing, of $50 cost of maintaining signals, $425 cost of watchman, and $300 cost of stopping trains, and claimed the allowance made by the commissioners was grossly inadequate; but the court declined to disturb it. In discussing the question, Justice Champlin used the following language:

" The question as to what elements of damages should enter into and form a basis of an award when one railroad crosses another has been before the courts of some of our sister States; and, while the decisions have not been entirely uniform, the principles underlying them all point to an allowance which shall secure a just compensation within the recognized rules of ovidence relating to damages, as including all loss or injury which is the direct result of the appropriation of the land to the new use. They also recognize that there are elements of damage which, aside

from being uncertain, remote, or conjectural, are the consequence of regulations by the legislature designed to secure the safety of the public, which are imposed upon all railroad companies alike, and which, in so far as they do not involve any structural change in the property itself in order to make it conform to the new condition, do not afford a basis for compensation.

"The result of the decision in Massachusetts was announced by Mr. Chief Justice Gray in *Massachusetts Central R. Co.* v. *Boston, etc., R. Co.*, 121 Mass. 124, tersely, as follows:

"'A railroad corporation, across whose road another railroad or a highway is laid out, has the like right as all individuals or bodies politic and corporate, owning lands or easements, to recover damages for the injury occasioned to its title or right in the land occupied by its road, taking into consideration any fences or structures upon the land, or changes in its surface, absolutely required by law, or in fact necessary to be made by the corporation injured, in order to accommodate its own land to the new condition. *Com.* v. *Railroad Co.*, 3 Cush. 25, 53; *Old Colony & Fall River R. Co.* v. *Inhabitants of Plymouth Co.*, 14 Gray, 155; *Grand Junction R. & Depot Co.* v. *Middlesex Co. Com'rs*, Id. 553. But it is not entitled to damages for the interruption and inconvenience occasioned to its business; nor for the increased liability to damages from accidents; nor for increased expense for ringing the bell; nor for the risk of being ordered by the county commissioners, when in their judgment the safety and convenience of the public may require it, to provide additional safeguards for travelers crossing its railroad. *Proprietors of Locks & Canals* v. *Railroad Corp.*, 10 Cush. 385, 392; *Boston, etc., R. Corp.* v. *Old Colony R. Corp.*, 12 Cush. 605, 611; *Same* v. *Old Colony & Fall River R. Corp.*, 3 Allen, 142, 146; *Old Colony & Fall River R. Co.* v. *Inhabitants of Plymouth Co.*, 14 Gray, 155.'

"In Illinois the principle was laid down in the case of *Chicago, etc., R. Co.* v. *Englewood Connecting R. Co.*, 115 Ill. 375 (4 N. E. 246, 56 Am. Rep. 173, 23 Am. & Eng. R. Cas. 56), founded upon the manifest fact that the value of a railroad property, outside of the advantages of location and amount of business it controls, consists in the strength, permanency, and durability of its structures, and its adaptability to and capacity for doing railroad business, 'that, whenever the proposed condemnation and subsequent user will injuriously affect such a property in either of these respects, the injury thus occasioned

will form a proper basis for the assessment of damages in a proceeding of this kind.' In this case the court on the trial excluded all evidence from the jury tending to show that either the value of the respondent's road, or its capacity to do the business of the company, would be impaired by the proposed crossing; and the court, upon a review of the authorities in that State, held that the court below erred. It had previously been held by that court that the law requiring trains to stop before reaching and crossing another road was a police regulation, and might be maintained or repealed, at the pleasure of the legislature; that it would therefore be mere conjecture as to what, if any, damages would be sustained for the delay, inconvenience, and trouble produced by complying with the requirements of the statute; and that, independent of the statute, the same duty would be imposed, and that it was too vague and uncertain to be an element of damages. *Peoria & Pekin Union R. Co.* v. *Peoria & Farmington R. Co.*, 105 Ill. 110.

"The point was more fully considered in an opinion filed at the same time with that above cited, and reported in the same volume, at page 388 ( 44 Am. Rep. 799 ), in which a rehearing was denied at the March term, 1883, in which the majority of the court held that damages occasioned by the stopping of trains could not be considered in awarding compensation ( *Chicago, etc., R. Co.* v. *Joliet, etc., R. Co.*). These decisions have not been overruled in that State. Such is also the conclusion reached by the supreme court of Ohio. *Lake Shore, etc., R. Co.* v. *Cincinnati, etc., R. Co.*, 30 Ohio St. 604.

" I think that the stopping of trains, whether required by the law as a police regulation, or by the duty of the company in order to secure the safety of persons transported, is not an element which can be considered by the jury in estimating the damages and compensation to be made. The general railroad law requires trains to come to a full stop before crossing the track of another railroad, not nearer than 200 nor more than 800 feet from the crossing. It regulates the precedence which trains shall have in crossing, and prescribes penalties for disobedience of the regulations. These are police regulations enacted by the legislature, designed to promote the public safety, and are as binding upon an existing road as one newly organized. They stand upon an equality before the law, and neither can levy tribute upon the other as a compensation for obedience to its requirements. 'It is subject to amend-

127 MICH.—15.

ment or repeal at any time the legislature may see fit; and for this reason, as well as for the absolute impossibility of determining in advance the number of trains which in the future operation of the road would be required to stop at such crossing, the damage arising therefrom is uncertain and conjectural. But, aside from this, any inconvenience or annoyance or loss suffered in obeying the police regulations of the sovereign authority is *damnum absque injuria.* * * * In the absence of the statute, the duty imposed by the circumstances upon the corporation to adopt and observe proper precautions to protect the lives of persons committing themselves to its care takes the force of law, and has its foundation in the same principles which underlie police regulations, namely, the protection and welfare of the public. In other words, the police regulation requiring trains to stop does not create a new duty, but compels the observance of an existing duty by the corporation. The statute or duty merely regulates the mode in which the corporation shall exercise its franchise. This incident to crossing takes no land, requires no structural change in the property, and deprives the corporation of no right granted by its charter. It does not lie within the scope of injuries for which compensation should be made. The cost of maintaining signals or a crossing system would be a proper matter for the consideration of the commissioners, as well as cost of watchman. These expenses, however, are subject to contingencies which may cause the damages to fluctuate, and possibly be reduced to a nominal sum."

The other cases cited are in harmony with the views expressed by Justice CHAMPLIN. These cases undoubtedly establish the doctrine that, within the limits of the rule as described by Justice CHAMPLIN, the junior highway or railroad seeking a crossing must bear all the expense of making the crossing, and restoring the highway or railroad crossing, as far as practicable, to safe conditions. This, however, relates to the conditions as they exist at the time the crossing is made, and not to conditions which may or may not arise thereafter. The damages must be real, tangible, and proximate. Allowances may not be made for possible or probable contingencies. *City of Grand Rapids* v. *Bennett,* 106 Mich. 528 (64 N. W. 585), and cases there cited.

We then come to the question of what the *status* of the two roads is after the compensation is made and the right of user by the junior road is obtained. While this question has never been, so far as we know, before this court, it has been before other courts. In *Lake Shore, etc., R. Co.* v. *Cincinnati, etc., R. Co.*, 30 Ohio St. 604, there is a full discussion of this aspect of the case:

"The franchise to be a corporation, entitled as such to own a right of way and to operate a railroad thereon, is granted by the State for the public benefit, in consideration of the supposed benefits accruing to the State and its people from the improvement and its use. The tangible property held for corporate purposes is a means of carrying out the purposes of the corporation. Each corporation has granted to it so much of the right of eminent domain as is necessary to obtain its right of way and to construct its road. The charters of these corporations are obtained under a general law, to authorize the creation and regulation of incorporated companies. 1 Swan & C. Rev. Stat. p. 271. The fact that one charter is older than another does not give it exclusive privileges or superior powers in prosecuting its business as public carrier of persons and property. If the elder company has exercised its power to condemn property for its right of way, and has constructed and is operating its road, that does not withdraw its property from the equal power of condemnation of its right of way for a crossing, to be enjoyed in common by a junior company. Such appropriation, to be used on equal and common terms, does not operate as a subversion or destruction of the former public use. It is only an increased burden upon its use, imposed for public purposes. * * * The right of the one to cross the track of the other is as clear and undoubted as was the right of the other, in the first instance, to cross the land of the original owner. They each derive this right by grant from the State, and not by purchase of the other. In each case the constitution protects the private property by requiring compensation to be paid.

"The right of transit across a railroad rests upon the same grounds as that of the right of railroads to cross the canals, rivers, and common highways of the State, and is as important a public use as the right of transit along them. New channels of trade and commerce and new highways for public travel are essential to the growth and

development of the State and the convenience and comfort of its people; and the power of the State to provide them is one of those sovereign powers, held in trust for the public welfare, which it has no right to grant away or surrender. This grant to railroad corporations is for the public accommodation. To assume that the road first located and constructed has the exclusive franchise of operating a road over the point of crossing, and that this right, as well as the property, must be paid for by the second road, does violence to the well-settled public policy of the State. These corporations owe their existence, and the right to exercise their franchises and privileges, to the principle that the State may employ such agencies as it may deem proper to promote the public welfare. These roads are great public highways, and as such are amenable to such reasonable regulations, not inconsistent with vested rights of private property, as will promote that object.

"When both roads are constructed, they are operated under charters granting equal franchises and privileges, and both are alike subject to the obligations that may be lawfully imposed. When the younger corporation has acquired its right of property in common with the older in a crossing, they become joint and equal owners, bound by mutual obligations to each other and to the public to so use this common right as to do no unnecessary harm to the other or to the public. To each corporation the maxim, '*Sic utere tuo ut alienum non lœdas*,' applies with special force. To enforce the principles of that maxim, and in the legitimate exercise of the police power of the State, the act of March 24, 1860 (1 Swan & C. Rev. Stat. p. 372*a*), was passed. * * * When the appropriation is made, paid for, and put to the new use, both companies stand on a perfect equality as to rights and privileges in the use of the crossing."

We can see no fault in the logic of this opinion. When the right to use the crossing is once acquired, the right of the several corporations to this use is reciprocal, so far as is consistent with the kind of use made of the crossing by them. Of course, in the case of a highway crossing over a railroad, from the very nature of the use the foot passengers and persons traveling in vehicles would be required to stop, instead of requiring the trains of cars to stop, because this would be the only practicable method

of running the trains and insuring the safety of the public. When the joint use of a crossing is obtained, is the position tenable that, because one road is older than another, the junior road must not only compensate the senior road for its present damage before it can cross, but for all time it must bear any additional future cost which may be made necessary by the erection and maintenance of appliances for the safety of the public, resulting from the increased use of the crossing? We think it logically follows from what has already been said that this question must be answered in the negative.

It is said:

"It cannot be pretended that without the existence of the steam-railroad crossing the railroad commissioner would have any jurisdiction, or that there would be any danger arising from the operation of the street railway which would call for an interference of the railroad commissioner. His jurisdiction only attaches because of the danger arising from the construction and operation of the steam railroad crossing the highway at the point in question."

It is a complete reply to this suggestion to say that, if there was no highway at this point traveled by a line of electric-railway cars and by the public, there would be no occasion for the interference of the railroad commissioner. It is because both of these conditions exist that human life is endangered at this crossing, and, under the exercise of the police power in the interest of public safety, the State is authorized to interfere through its agent, the railroad commissioner. See *Nashville, etc., R. Co.* v. *Alabama,* 128 U. S. 96 (9 Sup. Ct. 28); *Georgia R. & Banking Co.* v. *Smith,* 128 U. S. 174 (9 Sup. Ct. 47); *Minneapolis, etc., R. Co.* v. *Beckwith,* 129 U. S. 26 (9 Sup. Ct. 207); *Dent* v. *West Virginia,* 129 U. S. 114 (9 Sup. Ct. 231); *Charlotte, etc., R. Co.* v. *Gibbes,* 142 U. S. 386 (12 Sup. Ct. 255); *Minneapolis, etc., R. Co.* v. *Emmons,* 149 U. S. 364 (13 Sup. Ct. 870); *New York, etc., R. Co.* v. *Town of Bristol,* 151 U. S. 556 (14 Sup. Ct. 437); *Thorpe* v. *Railroad Co.,* 27 Vt. 150 (62 Am.

Dec. 625); *Woodruff* v. *Catlin*, 54 Conn. 295 (6 Atl. 853).

It is insisted by counsel for relator that the action of the railroad commissioner cannot be sustained for another reason. We quote from the brief of counsel:

" We contend that a street railway which has been granted a franchise to occupy a public street acquires a right to use the same in common with other members of the traveling public, and is not an additional burden upon the street, but is merely an adaptation of the highway to a particular means of travel, and does not constitute an additional servitude. A railroad is, on the other hand, an additional servitude, and, if it is built across a highway, it must do all things necessary to render the highway, for all its legitimate uses, as safe as it was before the railroad was built across it, or would be if such railroad were not built across it at all. The authority for this view is found in the following cases, and, although the facts to which the principles involved were applied differed from those of the case at bar, the principles themselves are involved here, and must, in our opinion, control,"— citing *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co.*, 139 Ind. 297 (38 N. E. 604, 26 L. R. A. 337, 47 Am. St. Rep. 264); *Chicago, etc., R. Co.* v. *West Chicago St. R. Co.*, 156 Ill. 255 (40 N. E. 1008, 29 L. R. A. 485); 2 Dill. Mun. Corp. (4th Ed.) § 722; *Chicago, etc., R. Co.* v. *Steel*, 47 Neb. 741 (66 N. W. 830); *Du Bois Traction Pass. R. Co.* v. *Buffalo, etc., R. Co.*, 149 Pa. St. 1 (24 Atl. 179); *Grand Rapids, etc., R. Co.* v. *Heisel*, 38 Mich. 62 (31 Am. Rep. 306); *Detroit City Ry.* v. *Mills*, 85 Mich. 634 (48 N. W. 1007); *Nichols* v. *Railway Co.*, 87 Mich. 369 (49 N. W. 538).

None of these authorities touch the question involved here. Nearly all of them, except the Michigan cases, are referred to in *Chicago, etc., R. Co.* v. *Steel*, 47 Neb. 741 (66 N. W. 830). The question involved was whether a railroad company was entitled to damages from a street railway line seeking a crossing. In disposing of the case the court said:

" The doctrine of the cases cited, and which to us appears altogether reasonable and sound, is that a railroad company acquires no exclusive use of streets crossed by its tracks with the consent of the city or other munici-

pal body, but must enjoy the right so conferred in common with the general public; that it is presumed to have contemplated the adoption of such improved means of travel as the exigencies of the case require in order to best subserve the public interests and necessities; and that any mere inconvenience suffered by it on account of the crossing of its lines by the tracks of street railways by permission of the proper authorities is *damnum absque injuria*."

In the Michigan cases the question involved was whether the adjacent owners were entitled to compensation where the street in front of their land was used by a street-railway company. In *Grand Rapids, etc., R. Co.* v. *Heisel*, 38 Mich. 62 (31 Am. Rep. 306), Justice COOLEY used the following language:

"If the railroad were only a city railway, constituting a mere local convenience, and calculated to relieve the pressure of traffic and travel upon the street, the question, of course, would be different. There are cases which hold it to be competent, under proper legislative authority, to permit a street-railway track to be laid, regardless of the consent or of the wishes of abutting proprietors who may own the soil of the street. A street railway for local purposes, so far from constituting a new burden, is supposed to be permitted because it constitutes a relief to the street. It is in furtherance of the purpose for which the street is established, and relieves the pressure of local business and local travel, instead of constituting an embarrassment. It is for this reason that the owners of lands over which a city street is laid are denied compensation if a street railway is subsequently authorized within it."

The same question was involved in the other Michigan cases, where electricity was used as motive power. It was held that the adjacent owner was not entitled to compensation, under the facts disclosed by those cases, though two of the five judges thought the building of the street railway did impose an additional burden, for which compensation should be given to the adjacent owner.

Though the decisions are not uniform, it may be considered as now settled by the great weight of authority

that the use of a street by a street-railway company, under proper regulations, even though it use electricity as a motive power, is not an improper use of the street, and is not such an additional burden as to entitle the adjacent proprietor to additional compensation. It does not follow, however, from these decisions, that the electric car and the horseless carriage do not increase the danger to those who have a right to travel the streets. If it be asserted that the propulsion of a modern suburban car, 45 or 50 feet long, which may be propelled, at the will of the motorman, at a speed from simply moving to 40 or 50 miles an hour, through the public streets of a city, is not a different use of the street, and a source of greater danger to the public, than obtained when the streets were used only by pedestrians and carriages drawn by horses, such an assertion would not commend itself to the common sense of those having cognizance of the facts. The long list of frightful injuries and fatal casualties which occur yearly because of the new methods of travel in all our large cities would be a complete answer to the assertion. Does it not follow then that, though the modern methods of travel are required by the conditions of modern life, inasmuch as they may and do increase the danger to human life, it is entirely competent for the State, in its efforts to protect its citizens in the exercise of its police power, to provide such regulations, at the expense of the persons or corporations employing the new methods, as in its wisdom it deems necessary to accomplish that purpose? Upon what other theory does it regulate the speed of the vehicles traveling the streets? Why does it require, at the expense of the corporation owning street cars, their frequent inspection, or require them to be equipped with powerful brakes and with safety fenders? Can there be any question but that it would be legal to require steam boilers used to propel horseless carriages to be so constructed as not to be liable to explosion, or to require the person operating such a carriage to be so familiar with its operation before taking it upon a crowded street that its appearance there

should not be a source of danger? It seems to us there can be but one answer to these questions. New dangers upon the public streets require new safeguards in the interest of the safety of the public. It is a matter of common knowledge that, where electric cars run at frequent intervals across a railroad over which trains are frequently run, it is a place of unusual danger, not only to the passengers in the steam cars, but also to the passengers in the electric cars. This danger is occasioned, not by the steam road alone, nor by the electric road alone, but by both of them. We have no doubt that, under such circumstances, the State, in the exercise of its police power, can take such steps as will minimize the danger, and can impose the expense of doing so upon the corporations causing the danger.

In Maine a statute similar to the statute of this State was passed in 1895, authorizing the railroad commissioners, in such a case as this one, to apportion the expense between the electric road and the steam road, though it did not require them to do so. Under this statute, the case of *Maine Central R. Co.* v. *Waterville, etc., R. & Light Co.*, 89 Me. 328 (36 Atl. 453), arose. In that case it was claimed, as it is claimed here, that the use of the crossing of the steam road by the electric road was simply a use of the highway. We quote from the decision of the commissioners:

"But the counsel for the electric-railway company goes further, and in argument claims that, by its charter, his company has the right for its electric cars to pass and repass across the rails of the Maine Central Railroad Company, and over the highway, the same as any other vehicle on said highway, and that the Maine Central Railroad Company is obliged, under the law, to make proper provisions for the passage of electric cars across its railroad tracks. He argues that the car of the electric railway is nothing more than the team or vehicle of any other person or corporation which has a right to pass and repass within the highway. He argues that the building of an electric railway along the highway in this State is not a new servitude upon the street, and is not a new use

of the way, but is only a new and later mode of using the way."

Under the circumstances of that case, the commissioners put the expense of putting in the new crossing frogs entirely upon the electric road. The case was removed to the supreme court, which declined to disturb the decision of the commissioners, the court using the following language:

"The act of 1895, chap. 72, undoubtedly authorizes the railroad commissioners to apportion the expense, but it does not require them to do so. It leaves the question to their sound judgment and discretion; and, on appeal, the only rule prescribed for the presiding justice is that he shall make such order or decree as law and justice shall require. The statute declares that 'exception may be taken to such order or decree,' but it prescribes no rules by which the law courts shall be governed in passing upon the exceptions. It seems to us that the evident intention of the legislature was to leave the whole question of how railroad crossings should be constructed and maintained, and how the expense of such crossings should be borne, in the first instance to the sound judgment and discretion of the railroad commissioners, and we think that their decision should not be altered or reversed unless manifestly illegal or unjust."

See *Commissioners of Parks & Boulevards of Detroit* v. *Railroad Co.*, 91 Mich. 291 (51 N. W. 934); *Woodruff* v. *Catlin*, 54 Conn. 277 (6 Atl. 849); *New York, etc., R. Co.* v. *Town of Bristol*, 151 U. S. 556 (14 Sup. Ct. 437).

We have no doubt of the right of the legislature to authorize the railroad commissioner to do what he has sought to do here.

The petition of the relator is denied.

Montgomery, C. J., and Long, J., concurred with Moore, J.

Grant, J. (*dissenting*). The main question in this case may be thus stated: When a steam-railroad company has condemned a right of way and extended its

tracks across a public street or highway on which is an existing street-car line, and at the time the public travel upon the street or highway was not such as to require the erection of gates, etc., for the protection of the public, but subsequently, owing to the increase of population, the increase of tracks and trains by the railroad company, and the increase of travel upon the street or the highway, the erection and maintenance of such safeguards becomes essential for the protection of the public, can the street-railway company be required to pay a portion of the expense? It is now the settled law of this State that a street railway does not create an additional servitude. *People* v. *Railway Co.*, 92 Mich. 522 (52 N. W. 1010). In addition to the authorities cited in *Detroit City Ry.* v. *Mills*, 85 Mich. 634 (48 N. W. 1007), and *Nichols* v. *Railway Co.*, 87 Mich. 361 (49 N. W. 538), see, also, the following: *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co.*, 139 Ind. 297 (38 N. E. 604, 26 L. R. A. 337, 47 Am. St. Rep. 264); *Chicago, etc., R. Co.* v. *West Chicago St. R. Co.*, 156 Ill. 255 (40 N. E. 1008, 29 L. R. A. 485). Another well-settled principle is of importance in this discussion, viz. : A steam railroad, in constructing its tracks across an existing highway, must pay all the expense of putting the highway in safe condition, and erecting and maintaining such safeguards as are required for the protection of travelers upon the street or highway, as well as those who are traveling upon the steam cars. The correlative proposition is also well established, viz. : When a public highway is laid out across an existing railroad, the public must compensate the railroad company, not only for the value of the land taken, but also for the construction of requisite safeguards, including gates, flagmen, fences, cattle-guards, etc., for the protection of the public. *Chicago, etc., R. Co.* v. *Hough*, 61 Mich. 507 (28 N. W. 532 ); *City of Grand Rapids* v. *Railroad Co.*, 58 Mich. 641, 648 ( 26 N. W. 159 ); *Commissioners of Parks & Boulevards of Detroit* v. *Michigan Central R. Co.*, 90 Mich. 385

( 51 N. W. 447 ); *Same* v. *Chicago, etc., R. Co.*, 91 Mich. 291 ( 51 N. W. 934 ); *City of Grand Rapids* v. *Bennett*, 106 Mich. 528 ( 64 N. W. 585 ); 8 Am. & Eng. Enc. Law (2d Ed. ), 351; *Du Bois Traction Pass. R. Co.* v. *Buffalo, etc., R. Co.*, 10 Pa. Co. Ct. R. 401. The elements of damages in such cases are ably discussed by Mr. Justice CHAMPLIN, in *Flint, etc., R. Co.* v. *Detroit, etc., R. Co.*, 64 Mich. 350 ( 31 N. W. 281 ), and many authorities there cited. Another well-established principle important to be here noted is this: He who creates and maintains a nuisance must pay the cost of abating it; and that business which, in its management, endangers the persons and property of others, must pay the expense of taking the necessary precaution to avoid the danger, and it matters not whether that danger existed at the time of the establishment of the business or arose afterwards. It follows that in 1882, when the Wabash Railroad Company constructed its single track across the highway, and in 1893, when the Union Terminal Association placed its tracks across, they were required by law to pay the expense of all appliances at that time necessary for the protection of the public. So, too, if these companies were now making application to cross the highway, they would be compelled to pay the expense of all the appliances which, in this proceeding, the commissioner has divided equally between the relator and the Union Terminal Association, and would be obliged to do so so long as they did business.

The argument of the learned attorney general seems to be that because, under the circumstances as they existed when the Wabash Railroad Company and the Union Terminal Association constructed their roads, damages for the cost of the appliances now required would then have been uncertain and speculative, and could not have been considered, therefore these companies cannot now be required to bear the entire expense. He states his position as follows:

"In behalf of respondent, I claim that said cases, while establishing the doctrine that a railroad company whose

track is crossed is entitled to just compensation for all damages which it may have sustained by reason of such crossing, do not sustain the claim made by counsel for petitioner, namely, that the Union Terminal Association Railway Company must for all time bear the expense of constructing and maintaining the safety contrivances and appliances mentioned in the commissioner's order, for the simple reason that, under the facts and circumstances of this case, the expense of constructing and maintaining said safety contrivances is not an element which can be considered in making up the just compensation to which petitioner is entitled under the Constitution and laws of this State.  *  *  *  This, court has never decided that where the necessity of safety appliances is created some 15 or 20 years after the crossing is made, solely in consequence of changed circumstances and conditions, resulting from the growth of the surrounding territory, that the road whose tracks were first laid shall be forever exempt from the burden of assisting in constructing and maintaining safety appliances made necessary by such changed conditions."

The injustice to the railroads is not apparent, because by holding them to bear the expense they are doing no more than the law would clearly require of them if they were now seeking to cross the highway. What is it that causes the danger to travelers upon the highway? Clearly, it is not the street cars. It is the trains of the railroad companies. The street-car companies, by relieving travel, may fairly be held to lessen the danger to otherwise over-crowded streets. Why should the street-car company, any more than an omnibus line or a stage company, using the same streets, be required to pay for the expense of protecting the public? If it be said that there is danger to travelers upon the steam railway from the street cars, the answer is ready that they are no more dangerous than heavy trucks, van wagons, stages drawn by four or six horses, or other vehicles. The street cars differ only from other methods of travel in that their carriages run upon rails. They have no more rights in going over the streets than other travelers have, except that other travelers are required reasonably to give the cars the right of way.

Under the police power, these street-car companies are subject to all reasonable rules in running their cars. . They may be, and now are, required by law to stop their cars a certain distance from the railroad crossing, and not to cross until some employé has gone to the railroad track, and signaled that the track is clear. The same rule might be required of stagecoaches. and any other conveyances with heavy loads.

In *Du Bois Traction Pass. R. Co.* v. *Buffalo, etc., R. Co.*, 10 Pa. Co. Ct. R. 401, the complainant, the street-railway company, filed its bill in equity to restrain the defendant, a steam-railway company, from interfering with the construction of its tracks in the public highway across the railway tracks. The defendant used force to prevent the construction. In the suit the defendant claimed that the street-railway company should pay damages to the defendant for injury to its business. It was there said:

"The respondent holds this right [ the use of the street ] subject to all the consequences flowing from the ever-increasing travel upon Booth street, and the use of all methods discovered or discoverable for the accommodation of the travel upon the surface of the street; and, if the respondent suffers any damages arising from the crossing of its track by the public, it is of a kind which it must be held to have assumed to itself when it entered upon Franklin street.   *   *   *   The crossing of its track by the passenger-railway company gives no greater right to damages, in the view we take of the case, than it could have if the claim was made against an omnibus line."

This case was approved in 149 Pa. St. 1 (24 Atl. 179). That case is quoted with approval in *Chicago, etc., R. Co.* v. *Steel*, 47 Neb. 741 (66 N. W. 830), where the authorities are reviewed, and the court holds "that it [the steam-railroad company] is presumed to have contemplated the adoption of such improved means of travel as the exigencies of the case require in order to best subserve the public interests and necessities."

In *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co.*,

139 Ind. 297 (38 N. E. 604, 26 L. R. A. 337, 47 Am. St. Rep. 264), it was held that the street-railway company was in the enjoyment of the public easement and use of the street, and that the right of the street railway to cross the tracks of the steam railway was subject to no conditions other than those to which the general public is subject in traveling over such streets.   The court said:

"It [the steam railway] never owned its right of way over and across the streets named free from the burden of the public easement, a part of which belongs to the appellee, the street railway."

The true rule seems to be that when a railroad company crosses a public street or highway, in the absence of any limitations in its charter, it obtains its right subject to all lawful uses to which the street may be put.   It obtains its right subject to the well-known fact that conditions change with the growth of population, and that it itself must meet the expense which these conditions have made necessary for the protection of travelers upon the highway or street.

The learned attorney general seems to concede that, were it not for this street railway, the commissioner, under the law and the police power, could place upon these rail. roads the entire cost of erecting and maintaining these appliances.   As we have shown and held, the street-car company is a lawful user of the highway, and, as such user, it cannot be selected to pay the whole or any part of the expense required for the protection of all who travel upon the highway or upon the railroad.   This disposal of the case renders it unnecessary to determine the other questions raised.

Since writing the above I have received the opinion of my Brother Moore.   The question involved is of such great importance that I feel justified in making a brief reply.   It is well to keep in mind the precise question for our determination.   The question is not between two steam railroads crossing each other on private grounds or on the public highway.   Neither is it between steam

railroads and the entire public using the highway. It is between steam railroads and one user of the public highway, and the question is, Who shall pay for the protection of the entire public? or, in other words, Can one user of the public highway be required to pay part or all of the expense of protecting all users of the highway and as well those traveling upon the steam road? It must also be borne in mind that no one is seeking to abridge, lessen, or destroy the police power of the State to adopt any and all regulations which are necessary to protect the persons and property of those using the highway or the steam road. This power remains the same. The State, either directly or through the municipality, can regulate the speed of street cars within 100, 500, or 1,000 feet of the crossing. It can compel them to stop at any distance from the crossing. It can regulate the speed of the steam cars when approaching. It can, as it now does, compel an employé on the street car to advance to the track before crossing, and see whether the crossing is safe. It may compel the steam road to erect gates, etc. I quote again from *Chicago, etc., R. Co.* v. *Whiting, etc., St. R. Co.*:

" So long, therefore, as it is the settled law of this State that a street railway is not an additional burden to that of the easement which the general public has in the street, and that the street-railway company's right to use the street is founded on that easement, that long it must be held that the right of such street railway to cross over the tracks of a steam railway laid on such street is subject to no conditions other than those to which the general public is subject in traveling over such streets. When the steam-railway company obtains its right of way over and along a public street, it does so subject to the right of the general public to use such street, and the street crossings over its tracks; and it is generally incumbent on such steam-railway company to make such crossings as passable for the general public as they were before the construction of their tracks thereon."

The logic of this case and others cited by me upon the same point is that the street railway is a proper, legiti-

mate, and necessary use of the public highway, and that it cannot be made subject to conditions "other than those to which the general public is subject in traveling over the streets." Wherein is the logic of compelling one user of the public highway to pay the whole or part of the expense in protecting all users of the highway against the dangers incident to the passage of long, swift, and pon- derous trains of steam cars? It is not the street car which causes the congestion of travel at this point; on the other hand, it relieves the congestion. The congestion is caused by the increase of population,—by vehicles of all sorts, engaged in the transportation of goods and passengers, and as well travelers on foot. My Brother refers to the horseless carriage as probably increasing the danger to those who have the right to travel in the streets. Will it be contended that the owners of horseless carriages could be selected from the owners of other vehicles using the highway, and compelled to in part or entirely pay for the expense of gates, etc., at a railroad crossing? If a cart- age company, a corporation, were engaged in the trans- portation of goods with its heavy trucks and enormous loads over this highway every 15 minutes or half hour in the day, could it be compelled to pay part or all of the expense to avoid the danger caused by the trains of the steam roads? Many vehicles, with their loads, are as heavy, and sometimes nearly or quite as large, as ordi- nary street cars. The tallyhos, with four or six horses, are certainly as dangerous at these crossings as are the street cars. But for the street cars there would be more conveyances of other character, and more congestion of travel, at these crossings, and consequently more danger than results from the use of the street cars.

It is urged that the facts in the cases I have cited are not those of this case, and that the precise question now before us was not involved in them. This is true. The same may be said of the cases cited in my Brother's opinion, unless it be the Maine case, to which I will refer hereafter. The question is a new one, and calls for the

application of principles to be deduced, so far as possible, from the decided cases, and by the application of sound legal principles.   My Brother says:

"If there was no highway at this point traveled by a line of electric-railway cars and by the public, there would be no occasion for the interference of the railroad commissioner. It is because both of these conditions exist that human life is endangered at this crossing, and, under the exercise of the police power in the interest of public safety, the State is authorized to interfere through its agent, the railroad commissioner,"—citing several cases.

Will it be said that if there were no electric cars there would be no necessity of interference by the commissioner or some other authorized body to protect the public and prevent danger? Is the electric car the sole cause of the danger, so far as it is caused by the using of the highway? Might not the danger be as great, or even greater, without the street car? The cases cited by my Brother relate to fences, cattle-guards, farm crossings, and the like, and do not touch this case. The statement of my Brother that, "under the exercise of the police power in the interest of public safety, the State is authorized to interfere," is the conceded law. But does that affect the question who shall pay for these safeguards? The authorities cited, apportioning the expense where one steam road crosses another, are not, in my judgment, applicable. He quotes extensively from *Lake Shore, etc., R. Co.* v. *Cincinnati, etc., R. Co.*, 30 Ohio St. 604. I understand the rule laid down in that case is the general rule approved by this court, and is applicable only to steam railroads, whether they cross one another on private grounds or the public highway. It has never been applied to street railways.

I am not aware, as my Brother suggests, that street cars in cities are allowed a speed of from 40 to 50 miles per hour. No ordinance so providing has ever been called to my attention. I doubt whether there are as many accidents at street-car crossings from collisions with street cars as with other vehicles. The fact that there

are frightful injuries and fatal casualties in the streets of the city, in consequence of collision with street cars, does not affect this question. Those accidents may result from the negligence of travelers, or from the employés of the street-car companies, or both, or from too great a speed allowed by the city, or in violation of the city ordinance. The question we are dealing with is one entirely foreign to those.

*Maine Central R. Co.* v. *Waterville, etc., R. & Light Co.*, 89 Me. 328 (36 Atl. 453), is cited as a case in point. The language quoted by my Brother from that case must be read and understood in connection with its facts. The steam-railroad tracks were first laid. The street-railway company recognized its duty, when it crossed, to place the necessary crossing frogs at its own expense. That this would be the legal duty of the street-railway company would hardly be questioned. These frogs were a part of the track of the street railway, and were necessary in its construction. They had become so worn as to be dangerous. The street-railway company claimed that it was the duty of the steam-railroad company to replace them, and to make proper provisions for the passage of the electric cars across the tracks of the steam road,—a proposition which could not commend itself to any one's judgment. The railroad commissioners very properly held that the street-railway company should bear the expense essential to enable it to cross the petitioner's track, and to keep it in repair. No other conclusion, in the exercise of good sense, could have been reached. The syllabus of the opinion reads as follows:

"Whenever an alteration is made in an existing railroad track for the sole convenience and accommodation of another railroad, the expense should be borne by the latter."

No question of the exercise of the police power was discussed or apparently involved. I am unable to see that that case controls this.

The question before us is not whether the legislature

may enact that the expense of crossings similar to this shall be borne, in whole or in part, by the entire public, nor whether the street-car company, in putting its tracks across a steam road, can be compelled to make an overhead crossing at its own expense. We are dealing with a case where the natural growth of public travel, through the increase of trade and population, has made the proposed safeguards necessary for the protection of all, and where the attempt is made to make one user of the public highway bear half the expense to the exclusion of all others.

The writ should issue.

HOOKER, J., did not sit.